NEW ENGLAND TELEPHONE AND TELEGRAPH COMPANY *vs.*
THOMAS A. KENNELLY, *Public Utility Adm'r.*

JUNE 30, 1949.

PRESENT: Flynn, C. J., Capotosto, Baker, Condon and O'Connell, JJ.

O'CONNELL, J. This is a bill in equity to enjoin the respondent in his capacity as public utility administrator

from interfering in any way with the complainant in immediately putting into full force and effect a certain rate schedule appended to and made a part of the bill. Following a hearing for a preliminary injunction, the superior court entered a decree granting such injunction in mandatory terms, and the operation thereof was then suspended by this court pending a hearing here on respondent's appeal therefrom. The cause is now before us on that appeal.

In view of the involved allegations and the situation presented by this bill we deem it advisable at the outset to explain our statute governing the fixing of rates for a public utility and to point out the particular provisions of the statute upon which the complainant seems to rely. The basic statute applicable here is general laws 1938, chapter 122. Speaking generally, this was amended by public laws 1939, chap. 660, commonly called the Administrative Act of 1939, and by P. L. 1940, chap. 821, which thereby vested the powers of the former division of public utilities in a public utility administrator appointed by the director of business regulation. Therefore, when we refer to any provision of said chap. 122 the word "division" as therein used shall mean the public utility administrator, hereinafter called the administrator.

Section 45 of chap. 122, as amended, in so far as pertinent provides that every public utility shall file with the administrator schedules, which shall be open to public inspection, showing all rates, tolls and charges established and in force at the time for any service performed by it within the state. It also provides: "No change shall be made in the rates, tolls, and charges which have been filed and published by any public utility in compliance with the requirements of this section, except after 30 days' notice to the division and to the public published as aforesaid, which shall plainly state the changes proposed to be made in the schedule then in force, and the time when the changed rates, tolls or charges will go into effect."

That section further provides that upon receiving any

notice from a public utility of proposed changes in rates, the division is empowered "to hold a public hearing and make investigation as to the propriety of such proposed change or changes. After notice of any such investigation, the division shall have power by any order served upon the public utility affected to suspend the taking effect of such change or changes pending the decision thereon, but not for a longer period than 3 months beyond the time when such change or changes would otherwise take effect. After such hearing and investigation * * * the division may make, such order in reference to *any proposed* rate, toll or charge as may be proper. * * * *Provided,* that the division may, *in its discretion and for good cause shown,* allow charges within less time than required by the notice herein specified, and without holding the hearing and investigation herein provided for, or modify the requirements of this section with respect to filing and publishing tariffs either in the particular instance or by general order applicable to special or particular circumstances or conditions." (italics ours)

Section 41 of that same chapter gives the division power to permit any public utility to temporarily alter, amend or suspend any existing rates, schedules and order relating to or affecting any public utility or part of any public utility in this state, "when deemed by it necessary to prevent injury to the business or interest of the people or any public utility of this state *in case of any emergency to be judged of by the said division.*" (italics ours)

Before its amendment, §31 of chap. 122 gave a public utility aggrieved by any order of the division the right to appeal to the supreme court on the ground that the charges so fixed were unlawful or unreasonable. This section was repealed by sec. 261 of the Administrative Act of 1939 and secs. 124 and 125 of that act were substituted in its place and stead. Section 124 provides: "Within the department of business regulation there shall be a public utility hearing board which shall function as a unit independent of the director and not subject to his jurisdiction." The public

utility hearing board, hereinafter called the board, consists of three members.

Section 125 originally provided that any decision or order of the administrator might be appealed to the board which was charged with the duty to make independent decisions in the matter. This section was amended in part by P. L. 1940, chap. 821, section 1, which provides as follows. The public utility administrator may "in the first instance" make such decisions and issue such orders as may to him seem proper; any person aggrieved by any such decision or order shall have the right to appeal to the board within a certain specified time, which board shall then, sitting "as an impartial, independent body in order to make decisions affecting the *public interest and private rights*," proceed to hear the appeal "*de novo* as to both the law and the facts and its decisions shall be based upon the law and upon the evidence presented before it by the public utility administrator and by the parties in interest." (italics ours)

Section 125, as amended, further provides that the public utility administrator or any other party in interest, if aggrieved by any order of the board, may appeal therefrom to the supreme court by following a certain procedure, which court shall then hear and determine the questions at issue in the manner therein indicated. The section concludes with the pronouncement that "the procedures established by this section shall constitute the *exclusive* remedies for persons aggrieved by any order or decision of the public utility administrator or of the public utility hearing board." (italics ours)

When G. L. 1938, chap. 122, as amended, is stripped of procedural details and fairly construed as a whole it is our opinion that the legislature had three main purposes in mind in enacting such legislation: first, to protect the public and the utility against improper or unreasonable rates, tolls and charges by providing what it considered as a full, fair and adequate administrative remedy, including an appeal *de novo* to a special administrative board; sec-

ondly, to secure ultimately to an aggrieved party a judicial review of such proceedings by an appeal to this court; and, thirdly, to make the prescribed procedures the exclusive remedies in such matters.

We will now turn to the allegations in complainant's bill, which when read as a whole presents a perplexing situation. It appears therefrom that on June 3, 1947 the complainant, hereinafter called the company, filed with the respondent administrator a revised schedule of rates, estimated to yield $2,700,000 additional revenues, as a substitute for the schedule then in force. The administrator, under the provisions of the statute, thereupon suspended the effective date of such proposed rates for the period of three months, pending his investigation. Due to the nature and extent of the investigation, the time within which he was required to give his decision was further extended by stipulation of the parties and by a special act of the legislature. On March 31, 1948 the administrator by his order No. 6162 fixed a new rate base and established a schedule of rates calculated to increase the company's revenues by $1,200,000, which according to *such rate base* would in his judgment yield a return of 5.6 per cent to the company. From this order the company duly appealed to the board, where it was entitled to a hearing *"de novo* as to both the law and the facts."

But notwithstanding the taking and pressing of such appeal, the company on April 15, 1948 presented to the administrator for his approval a "proposed schedule of rates" for the purpose of obtaining immediately increased revenues in the amount of $1,200,000 annually. The administrator, by his order No. 6168, dated April 15, 1948, approved such proposed schedule of rates which went into effect the next day. At all times from and after April 16, 1948 the company has been receiving such increased revenues in accordance with the schedule of rates thus approved.

While order No. 6162 was pending on appeal before the board, the company on October 15, 1948 filed with the

administrator another and new revised schedule of permanent rates estimated to yield additional annual revenues of $2,656,500 over and above the amount of $1,200,000 allowed by the administrator's order No. 6168. This new schedule also was suspended by the administrator pending investigation and December 20, 1948 was set as the date for the beginning of hearings thereon. In support of this revised schedule of October 15, 1948 the company claimed, according to its allegations in the bill, that through experience the schedule approved by the administrator on April 15, 1948 in his order No. 6168 had proven inadequate to produce the earnings and return allowed the company in that order because of increases in wages and also because the company among other things "had made *substantial increases in its investment* for the purpose of furnishing telephone service to the people of Rhode Island." (italics ours)

At some unspecified date prior to the hearing on December 20, 1948, the company filed with the administrator in that proceeding a written motion for immediate relief without prejudice to the filing of October 15, 1948 or to any of its other rights. By this motion the company requested the administrator, "pending and without prejudice to a full hearing" on said filing of October 15, 1948, which was then before him, to authorize it to file and put into effect on one day's notice a schedule of rates which would increase its annual revenues $1,113,000 over and above the $1,200,000 then being produced by order No. 6168.

The aforesaid motion was argued to the administrator on December 20, 1948. He then ruled that he would hear evidence thereon at the conclusion of the company's *direct* evidence respecting the October 15, 1948 schedule. The bill further alleges that this action of the administrator constituted a denial of the company's request for immediate partial relief; that on the basis of the actual operating experience for the ten months ending October 31, 1948 it had failed to earn the 5.6 per cent rate of return which

the administrator had ruled it was entitled to receive; and that according to its own books and computations it was incurring a loss of more than $9000 before contract debt expense, and had fallen short by $467,000 of meeting its intrastate costs of operation and its contract costs of debt capital allocable to Rhode Island intrastate property.

On December 30, 1948 the company filed in the superior court sitting in equity its first bill of complaint against the administrator, resting its claim for relief in that court on the ground that its property was being taken for public use without just compensation for the above-stated reasons. While prosecuting that bill, however, the company also continued to press before the administrator its claim with reference to the October 15, 1948 schedule and its related motion for additional immediate and temporary relief in the sum of $1,113,000. The hearings in that matter before the administrator, which began December 20, 1948, were concluded on January 7, 1949. Just before the close of the hearing on the latter date, the company presented another motion to the administrator asking that it be allowed rates that would yield "approximately $1,000,000 more in gross revenues than the $2,656,500 from the rates filed October 15, 1948" in order that it might earn "at least 7% on the net intrastate investment."

While an appeal by the administrator from the decree of the superior court on the first bill in equity was pending before us, he, on February 15, 1949, entered his decision, identified as order No. 6357, denying without prejudice the October 15, 1948 schedule and also denying the two motions for additional temporary relief hereinbefore described. On February 17, 1949 the company duly appealed from that order to the board, and on the following day the first bill of complaint was voluntarily discontinued by stipulation of the parties. However, on the same day, February 18, 1949, the company, notwithstanding its appeal under the statute to the board, brought the present bill in the superior court claiming that the above-mentioned

order No. 6357 was "confiscatory in that it will result in the taking of the Company's private property for public use without just compensation, contrary to the statutes and Constitution of Rhode Island."

In addition to the allegations already stated, the present bill further alleges that "On the basis of the actual operating experience for the ten (10) months ended October 31, 1948" the company had not only failed to earn the rate of return which the administrator had ruled it was entitled to receive according to orders Nos. 6162 and 6168 but also that under the schedule thereby put into effect it was operating at a substantial loss as hereinbefore stated. It further alleges that it requires the sum requested as partial relief "to expand its plant in Rhode Island more than has already been done"; to furnish additional adequate telephone service to the people of this state; to improve its earnings so as to attract "additional new capital required to carry on the construction projects necessary to furnish adequate service"; to cover its costs for increased wages since the date of the administrator's order and other commitments according to its own estimates; and to protect itself from further impairment of its financial credit.

It is important to note at this point that there is no allegation in the present bill that the company ever filed with the administrator any schedule of rates as a basis for and in support of its motion of December 20, 1948 for additional immediate partial relief in the sum of $1,113,000 and the motion itself, which is attached to the bill, contains none. Nor does the present bill allege that the company filed with the administrator any schedule of rates to support its motion of January 7, 1949 seeking additional and still further immediate partial relief in the sum of $1,000,000.

The prayer of the present bill is that the administrator be enjoined both temporarily and permanently from compelling the company to continue to collect only the rates which he has approved and are now in effect, on condition,

however, that it "shall not charge rates in excess of those set out and described in Schedule B filed with the Bill of Complaint," and upon the further condition that it file in this cause its written undertaking secured by a bond to be approved by the superior court to make any refunds to its customers which that court might direct in its final decree. Upon a hearing for preliminary injunction the trial justice granted the prayers of the bill in all their terms as fully as if he had heard it on the merits. Thereupon the administrator duly appealed to this court which granted his motion to stay operation of that decree pending hearing and determination of the appeal.

It must be obvious that the company is pursuing both administrative and judicial remedies at the same time, at least in so far as the motion for immediate temporary relief in the sum of $1,113,000 in connection with the October 15, 1948 schedule is concerned. Because of this it is difficult to tell from the bill whether the company relies for judicial relief upon its compliance with an unspecified provision of the statute, or whether it believes that, irrespective of the statute, it may invoke the assistance of a court of equity by merely claiming confiscation based solely on its own alleged experience, separation factors and computations, thus avoiding the administrative remedy prescribed by the statute. Under either of these contentions the basic and controlling question in this cause is whether the superior court in the circumstances as they appear from the bill had jurisdiction in the matter.

We are of the opinion that where an adequate statutory remedy is provided the company cannot first proceed in equity for immediate partial relief. It is undeniable that the public is vitally interested in the rates to be charged by a public utility and that the ultimate purpose of the legislature in enacting the statute with reference to the manner in which such rates should be fixed or changed from time to time was to secure the orderly promulgation of rates that would be reasonable and just to the company

and to the public. Furthermore, as the fixing of rates of a public utility is generally recognized as in essence a legislative rather than a judicial function, it is clear to us that it was not the intention of the legislature to constitute the superior court sitting in equity as in effect a rate-making body in the first instance.

Our examination of the many cases dealing with the necessity of exhausting the prescribed administrative, remedies before recourse may be had to judicial proceedings shows that where a remedy for the fixing or altering of rates is prescribed by statute, such remedy must ordinarily be exhausted before a court of equity will intervene. This general principle is supported by the great weight of authority. It is so universally accepted that we need not refer at any length to the many cases in support thereof. We therefore confine ourselves to the following cases as illustrative.

In *Myers* v. *Bethlehem Shipbuilding Corp.*, 303 U. S. 41, the supreme court held that a federal district court was without jurisdiction to enjoin the national labor relations board from holding a hearing upon a complaint filed by it against an employer alleged to be engaged in unfair labor practices. At pages 50 and 51 of that opinion, the court, in discussing the principle of the exhaustion of administrative remedies, used the following language: "The Corporation contends that, since it denies that interstate or foreign commerce is involved and claims that a hearing would subject it to irreparable damage, rights guaranteed by the Federal Constitution will be denied unless it be held that the District Court has jurisdiction to enjoin the holding of a hearing by the Board. So to hold would, as the Government insists, in effect substitute the District Court for the Board as the tribunal to hear and determine what Congress declared the Board exclusively should hear and determine in the first instance. The contention is at war with the long settled rule of judicial administration that no one is entitled to judicial relief for a supposed or

threatened injury until the prescribed administrative remedy has been exhausted. * * * Obviously, the rule requiring exhaustion of the administrative remedy cannot be circumvented by asserting that the charge on which the complaint rests is groundless and that the mere holding of the prescribed administrative hearing would result in irreparable damage."

In the same case the court also passed upon the constitutionality of a provision in the statute making the administrative procedure the exclusive remedy for relief to be followed before application for relief could be made to the court. At page 48, in declaring that the district court lacked jurisdiction, the court stated: "The grant of that exclusive power is constitutional, because the Act provided for appropriate procedure before the Board and in the review by the Circuit Court of Appeals an adequate opportunity to secure judicial protection against possible illegal action on the part of the Board."

In *St. Clair Borough* v. *Tamaqua & Pottsville Elec. Ry.*, 259 Pa. 462, the court affirmed on appeal two orders denying injunctive relief and dismissing the bill of complaint on the ground of lack of jurisdiction. At pages 468 and 469 the court, in discussing the necessity of a public utility to apply to the public service commission in accordance with the provisions of the statute before the courts could be resorted to for relief, used the following language: "Since the Public Service Company Law has been upon our books, we have consistently adhered to the rule that matters within the jurisdiction of the commission must first be determined by it, in every instance, before the courts will adjudge any phase of the controversy (Bethlehem City Water Co. v. Bethlehem Borough, No. 2, 253 Pa. 333, 337-8; New Brighton Borough v. New Brighton Water Co. et al., 247 Pa. 232, 240, 241, 242) ; and it is plain that orderly procedure requires an adherence to this practice, otherwise different phases of the same case might be pending before the commission and the courts at one time, which

would cause endless confusion * * *. 'The disposition everywhere is to commit questions, relating to the regulation and to the rates of public service corporations, to the supervisory powers of special tribunals, and, concededly, matters of this character are within the domain of legislative action.' "

In *Abelleira* v. *District Court of Appeal*, 17 Cal. 2d 280, which was a proceeding in prohibition to restrain the district court of appeal from enforcing a writ of mandate and temporary restraining order directed against the California employment commission, the writ was granted. At pages 291 and 292 the court in overruling the order of the district court used the following language: "The employers have no standing to ask for judicial relief because they have not yet exhausted the remedies given them by the statute. They still have their appeal to the commission, which appeal has not yet been decided adversely to them, and prior to the prosecution of this appeal they have no right to demand an extraordinary writ from a court. This is the doctrine of 'exhaustion of administrative remedies.' " The court then cites twenty-two cases in support of this proposition, including eight cases decided by the United States supreme court and seven decided by other federal courts. In accord with those cases see *United States* v. *Illinois Central R. R.*, 291 U. S. 457; *Natural Gas Pipeline Co.* v. *Slattery*, 302 U. S. 300; *McCollum* v. *Southern Bell Tel. & Tel. Co.*, 163 Tenn. 277; *Town of West New York* v. *Board of Public Utility Comm'rs*, 105 N. J. Eq. 438; *City of Cadillac* v. *Citizens' Tel. Co.*, 195 Mich. 538.

There are some exceptional cases where, because of unusual circumstances, the equity court has taken jurisdiction. Among those cases relied upon by the company are the following: *Smith* v. *Illinois Bell Tel. Co.*, 270 U. S. 587; *Prendergast* v. *New York Tel. Co.*, 262 U. S. 43; *Oklahoma Natural Gas Co.* v. *Russell*, 261 U. S. 290; *Southern Bell Tel. & Tel. Co.* v. *Georgia Public Service Comm'n*, 203 Ga. 832; *Staten Island Edison Corp.* v. *Maltbie*, 296 N. Y. 374;

*Public Service Comm'n* v. *Indianapolis Rys,* 225 Ind. 30; *Columbus Gas & Fuel Co.* v. *City of Columbus,* 17 F.2d 630; *Trautwein* v. *Moreno Mutual Irrigation Co.,* 22 F.2d 374. But none of those cases, in our opinion, hold that the company may go into equity *regardless* of a procedural statute that provides an adequate remedy, and particularly where the statute, as here, expressly makes the procedure therein specified the exclusive remedy.

Upon examination of all the cases cited to us by the company in which relief has been granted in equity we find that they may be grouped generally in these categories: 1. Where the question of jurisdiction or exhaustion of administrative remedies was not raised by either of the parties. 2. Where the court review provided by code or statute was held to be legislative rather than judicial. 3. Where jurisdiction in equity was specially provided for by code, statute, or rule. 4. Where there is either no statutory method of relief provided or where the statute makes no provision for judicial review. 5. Where the administrative remedies provided are in the alternative and the aggrieved party has the choice of remedies. 6. Where the court has determined that the administrative remedies have been exhausted. 7. Where the court has determined that, although the administrative remedies have not been exhausted, it would be futile to pursue them because the administrative agency has indicated its refusal to consider them or where inaction or long delay in making its decision has in effect amounted to a denial of such remedy. 8. Where the statute does not provide that the statutory remedy shall be the exclusive remedy. Here the statute provides both an adequate and exclusive remedy. An analogous grant of exclusive power was held constitutional at page 48 of the opinion in *Myers* v. *Bethlehem Shipbuilding Corp., supra.* In our opinion the instant cause is clearly distinguishable from the type of cases upon which the company relies.

According to our understanding of the company's other

main contention its ultimate position is that if it could not go into equity regardless of the statute, then in the circumstances of this cause it had exhausted the administrative remedy when the administrator, according to the company's interpretation of his decision of December 20, 1948, denied its motion for immediate temporary relief in the sum of $1,113,000. It appears from the allegations in the bill and the undenied argument before us that the company's claim to such additional revenues for immediate temporary relief was premised on a rate base fixed by the company from a breakdown of its receipts and expenditures as they appeared on its books over a period of some ten months of actual operation from and after April 15, 1948, when the administrator had allowed the company to increase its rates so as to provide additional revenues in the sum of $1,200,000. In other words, the loss that the company claims to have sustained during that period is computed on a rate base of its own making which was *different* from the rate base fixed by the administrator in his order of April 15, 1948 and it is not alleged that the company's rate base was ever investigated or approved by the administrator.

The company's contention is premised basically on the assumption that the administrator was of the opinion that the increased rates allowed by him on April 15, 1948 would earn a rate of return of 5.6 per cent, and therefore that such return should thereafter always be earned by it, irrespective of whatever expenditures it might decide upon or be obliged to make in the future with reference to capital investment, expansion of service, increase in wages and other prospective expenses. From such assumption it proceeded to fix a rate base of its own on its undefined operations for a period of about ten months, including also contemplated future expenditures for new undertakings, and then, finding that it had failed to earn a return of 5.6 per cent on that self-created rate base, it applied to the administrator for immediate partial relief in the sum of

$1,113,000 in order to maintain that return. Upon the administrator's ruling that he would hear that motion after the company's direct evidence had been presented, the company treated such ruling as an absolute denial of such request and immediately sought relief in equity claiming that the existing rates were confiscatory. The company further contends, as we understand it, that the grant or denial of immediate temporary relief rests solely with the administrator; that the statute does not require or permit an appeal to the board in case of an adverse decision; and that in any event the statutory remedy is entirely inadequate in a case of emergency.

The company's contentions as thus interpreted by us from a confused situation are ingenious but in our judgment unsound. We first note that the administrator did not refuse to consider the company's motion of December 20, 1948 for immediate partial relief and that therefore in the circumstances it was not warranted in treating his action at that time as an absolute and final denial of that motion.

According to the bill itself and the exhibit attached thereto, the motion was made at the beginning of the hearing before the administrator on the company's filing of a revised schedule for new rates intended to increase the annual gross income by $2,656,500 over and above any rates then in effect. When the company asked that the motion be heard immediately, irrespective of any particular connection with the main issue then before the administrator, the latter merely ruled that he would not hear evidence on the motion until after the conclusion of the company's *direct* evidence with reference to the October 15, 1948 schedule. The company's claim that this constituted an unqualified denial of its motion is unwarranted. Fairly construed that ruling amounted to nothing more than to defer the hearing on the motion for a relatively short time, as the entire hearing on the main question then before the administrator was completed on January 7, 1949.

The company's further contention to the effect that by the administrator's ruling of April 15, 1948 it was assured a return of 5.6 per cent on its future activities and expenditures, whatever they might be, is based upon pure assumption. The company was undoubtedly entitled to a fair return on its investment, but it had no right to assume that a return fixed by the administrator on a rate base established by him was to be and remain the same return on a rate base fixed by the company from a state of facts that he never had an opportunity to know and much less to investigate. The statute does not charge the administrator with the duty of fixing a rate of return that shall remain invariable under all conditions. If he deemed a return of 5.6 per cent reasonable on a rate base fixed by him after full investigation, it does not follow by any means that the company can establish a different rate base of its own and then claim that because it is not earning a return of 5.6 per cent thereon its property is being confiscated.

The company cites no authority for its contention in this respect. However, in speaking of the return on the investment of a public utility, the supreme court in *Federal Power Comm'n* v. *Natural Gas Pipeline Co.,* 315 U. S. 575, at page 590, used the following language which is pertinent in the case at bar: "But regulation does not insure that the business shall produce net revenues, nor does the Constitution require that the losses of the business in one year shall be restored from future earnings by the device of capitalizing the losses and adding them to the rate base on which a fair return and depreciation allowance is to be earned. *Galveston Elec. Co.* v. *City of Galveston,* 258 U. S. 388; *San Diego Land & Town Co.* v. *Jasper,* 189 U. S. 439, 446-447. The deficiency may not be thus added to the rate base, for the obvious reason that the hazard that the property will not earn a profit remains on the company in the case of a regulated, as well as an unregulated, business." See also *New England Tel. & Tel. Co.* v. *State,* 95 N. H. 353.

In the instant cause if the company ascertained after ten months of experience that it was not earning a fair return on its investment due to a policy of expansion on its part, or to generally changed economic conditions, or to a combination of these and other causes as alleged, it had a remedy. That remedy was to ask for a revision of the rates in accordance with the statute rather than to formulate a new rate base of its own and then resort to a court of equity claiming that it was not earning the return previously fixed by the administrator under different conditions and after full investigation.

But the company also contends in effect that it was confronted with an "emergency" which entitled it to immediate temporary relief, and that the administrator should have granted such relief *forthwith,* because it was not earning a return of 5.6 per cent on a rate base fixed by itself. Yet, as we have already stated, it fails to indicate by any specific allegation in the bill or otherwise the precise provision in the statute upon which it rests that claim. In our judgment the only provisions of the statute that the company can possibly invoke are §41 and the proviso in §45, chap. 122, as amended.

Briefly restated, §41 gives the administrator power to permit a public utility to temporarily alter, amend or suspend any existing rates in case of any emergency *to be judged of by him* and to have relief only when deemed *by him* necessary to prevent injury to the business of the utility. Without intending in any manner to construe the meaning of the word "emergency" in that section, the weakness in such contention is that the administrator never judged that in his opinion the company was confronted with an emergency. In the circumstances such a condition was assumed to exist by the company and was not determined by the administrator, as is expressly his right and duty under the statute.

To avoid such a conclusion the company argues that when the administrator refused to consider *forthwith* evi-

dence with reference to its motion of December 20, 1948 he in effect denied its motion for immediate temporary relief. This argument is unconvincing for the reason that what the company construes as an absolute denial was merely a ruling postponing the requested hearing for a relatively short time until the administrator had heard the company's direct evidence on the main issue to which the motion was related. Therefore if the motion is considered under §41 of the statute we find that the company never complied with its provisions, never exhausted its remedy thereunder and was not in fact denied relief by the administrator at that time.

We reach a similar conclusion if the company's motion is considered under the proviso in §45. It is there provided that the administrator *in his discretion and for good cause shown* may allow charges within less time than required by the notice and without holding the hearing and investigation as specified in that section, and may otherwise in special circumstances modify the requirements thereof as to the filing and publishing of tariffs. In our opinion that proviso was added to give the administrator adequate power to grant immediate temporary relief in a proper case. In the circumstances of this cause, however, the company can derive no benefit from this proviso for the same reasons given by us in discussing §41. By its own impatience and impulsive conduct at the hearing of its motion on December 20, 1948, the company practically denied itself the opportunity to show "good cause" for its request for immediate temporary relief and also prevented the administrator from proceeding according to the statute and from exercising *his discretion* in determining whether sufficient cause was shown to warrant additional immediate temporary relief pending determination of the merits of the company's appeal to the board.

In addition to the matters hereinbefore discussed, there is a further and even more fundamental reason that militates strongly against the company's contentions. Section

45 requires the filing of a schedule with the administrator setting forth *any proposed changes* in rates. It may be argued that such provision relates only to the establishment of permanent rates and that it is inapplicable where only immediate temporary relief is requested. Such an argument is not convincing.

There is nothing in that section or elsewhere in the statute which excuses the company from filing a schedule with the administrator in the case of a request for any proposed change in rates whether temporary or permanent. As a matter of fact its plain intent is clearly to the contrary. While the proviso in that section gives the administrator power, in his discretion and for good cause shown, to allow charges within less time than required by the notice without holding a hearing, and otherwise to modify the requirements of the section with respect "to filing and publishing tariffs" in special circumstances, there is nothing in that section to warrant the assumption that upon a motion for immediate temporary relief the company can relieve itself of the obligation to present to the administrator for his consideration a proposed schedule of rates to yield the additional gross revenues deemed by it necessary. It is inconceivable to us that the legislature intended to allow the utility to proceed on its bare request for immediate temporary relief under the proviso without accompanying that request with a schedule of proposed rates so that the administrator acting in his official capacity might have a reasonable opportunity to perform his duty under the statute and to determine whether he should exercise his discretion in granting such request.

Significantly the bill has appended to it as a part thereof a schedule of rates upon which the court was requested to act. As already stated, however, there is no allegation in the bill that any schedule of rates covering the company's request for immediate temporary relief was ever filed with the administrator in connection either with its motion of December 20, 1948 or that of January 7, 1949.

442

This fact, although stressed by the respondent at the hearing before us, was not denied by the company. Moreover the schedule attached to the bill nowhere indicates what revenues would be returned by those rates if put into actual operation. Whether such schedule would produce revenues of $1,113,000, or $1,000,000, or the total of those two sums, or in excess of $2,656,500 under the company's proposed revised schedule of October 15, 1948 is left to conjecture and speculation.

The public, which has at all times a definite interest in the rates that it must pay for the services of a public utility, should not be forgotten or left in the dark respecting any changes in existing rates and the amount of revenue that the utility expects to receive under any proposed schedule, whether temporary or permanent. In the instant cause the company sought approval by the superior court in the first instance of a schedule of rates which might produce any amount of revenues within or without the limits just above mentioned.

Before expressing our final conclusion the following facts should be recalled.

1. This cause does not present a case where the company's rates have been reduced, or where it has been deprived of the benefits of any increase in its existing rates pending determination of the proposed revision of the permanent rate schedule filed October 15, 1948 and now before the board on the company's appeal.

2. Our statute provides for administrative procedures with an ultimate judicial review, and expressly makes those procedures the exclusive remedy in cases of this kind.

3. The administrator has ample power under either §41 or §45 of the statute, upon a proper application and showing, to order immediate temporary relief as complete as was granted by the superior court sitting in equity.

4. An appeal under the statute lies from any "decision or order" of the administrator to the board where the case must be heard "*de novo* as to both the law and the

facts," thereby necessarily vacating any decision or order of the administrator from which an appeal is taken.

5. The administrator did not deny the company's motion for additional immediate temporary relief in the sum of $1,113,000 when such motion was presented by the company on December 20, 1948. He merely deferred his determination thereof for a relatively short time until the company presented its *direct* evidence upon the revision of the permanent rate schedule filed October 15, 1948 with which the motion was related.

6. The company, however, did not see fit to wait for action on its motion until its presentation of such direct evidence. But on December 30, 1948, although at the same time continuing to present evidence before the administrator in the proceeding to which that motion was related, it nevertheless filed in the superior court its first bill in equity and later filed its present bill seeking to put into immediate effect a schedule of rates attached thereto and to enjoin the administrator from preventing the filing and operation of such rate schedule.

7. The administrator, by approving the proposed schedule of rates requested by the company on April 15, 1948, in effect granted to the company substantial immediate temporary relief to the extent of $1,200,000.

8. There is no allegation in the bill, directly or by reference, and no claim is made in argument that the company ever filed with the administrator any proposed schedule of rates in connection with either of its motions for additional immediate temporary relief.

9. The schedule appended to the instant bill and approved by the court upon a motion for temporary injunction was based upon a rate base which was *fixed by the company* and never investigated, approved or allowed by the administrator.

After careful consideration of the instant cause we are of the opinion that the company not only failed to exhaust the administrative remedy which is prescribed in the statute

but also failed to initiate such proceedings properly before the administrator in accordance with such statutory requirements. Under these conditions recourse to a court for equitable relief is plainly an evasion of the statute, as it is not the province of the courts to enter upon the mere administrative duty of framing a tariff of rates. *Covington & Lexington Turnpike Road Co.* v. *Sandford,* 164 U. S. 578. It is therefore our opinion that the superior court in the existing circumstances was without jurisdiction to entertain this bill.

The respondent's appeal is sustained, the decree appealed from is reversed, and the cause is remanded to the superior court with direction to enter a decree denying and dismissing the bill of complaint.

CONDON, J., dissenting. I am constrained to dissent because, in my opinion, the superior court had jurisdiction to grant the preliminary injunction under review if the evidence clearly showed confiscation under existing rates. The issue raised by the complainant's bill was solely that, and not whether such rates were fair and reasonable. It was, therefore, a purely judicial question cognizable by the superior court in equity. I agree that if it were a question merely of fixing fair and reasonable rates it would be legislative, and hence exclusively within the province of the administrative process prescribed by statute. The determination of such an issue cannot be removed to a court even for review of error of law until the administrative remedy is exhausted. *Myers* v. *Bethlehem Shipbuilding Corp.,* 303 U. S. 41.

On the other hand, the resolution of an issue of alleged confiscation of property in defiance of due process of law is beyond the exclusive province of the administrative process and cannot be confined within it by the legislature, although the legislature may vest in an administrative officer concurrent authority with the courts to grant relief from such invasion of constitutional right. However, under the judicial system in this state, a grant of power of that

kind cannot divest the superior court of its exclusive original jurisdiction in such a case, unless that jurisdiction is transferred to some other *court*. In other words, such authority is judicial and must be vested in a court. Whether the opportunity for obtaining from an administrative officer relief under a statute, as for example §41 or the proviso in §45, is in fact adequate for the protection of complainant's constitutional right against alleged confiscatory rates is a proper question for the superior court in determining whether it is necessary to exercise its equitable powers in order to afford complainant such protection. That is to say, it may deny relief in equity because in its opinion complainant. has an adequate remedy at law, but in any case it has *jurisdiction* either to grant or deny relief.

The authorities are in agreement on this point. "We find no decision of any American court," the supreme court of Georgia very recently said, "where it has been held that when confiscation is clearly shown the court will refuse an appeal of the injured party for a judgment protecting his constitutional right." . *Southern Bell Tel. & Tel. Co.* v. *Georgia Public Service Comm'n,* 203 Ga. 832, 871. Where adequate means were lacking under the administrative process or where the manner of administering such means was inadequate it was held in *Peoples Gas Light & Coke Co.* v. *Slattery,* 373 Ill. 31, that an independent proceeding in equity was justified to prevent confiscation. There the distinction between a proceeding in equity for that special purpose and one under the administrative process to fix fair and reasonable rates was clearly pointed out. In that case an application for temporary relief was denied by the commission and the company appealed. Pending such appeal the company sought relief in equity. to prevent confiscation of its property. Resort to the judicial process at that stage was held justifiable by the state supreme court which cited in support of its holding *Smith* v. *Illinois Bell Tel. Co.,* 270 U. S. 587, and *Prendergast* v. *New York Tel. Co.,* 262 U. S. 43.

The United States supreme court has held consistently that it is not necessary to exhaust the administrative process before invoking the aid of a court of equity to prevent daily confiscation of property resulting from alleged confiscatory rates. *Oklahoma Natural Gas Co.* v. *Russell,* 261 U. S. 290; *Pacific Tel. & Tel. Co.* v. *Kuykendall,* 265 U. S. 196; *Banton* v. *Belt Line Ry.,* 268 U. S. 413; *Smith* v. *Illinois Bell Tel. Co., supra.* My examination of those cases and many others similar thereto in the inferior federal courts leads me to believe that in the present juncture of the instant rate proceedings this court's denial of the judicial process to the complainant will not be followed if it seeks relief in those courts. Since the question of confiscation is in fact ultimately a federal question, or at least may be made such by an aggrieved party who is prevented from obtaining equitable relief in our state court, the federal cases are in my opinion most persuasive. If for no other reason I would prefer to be guided by them in determining the question of jurisdiction in the case at bar.

However, aside from the federal phase there is good reason for holding that in the special circumstances here the superior court had jurisdiction. Complainant, by motion duly filed, applied to the administrator for temporary emergency relief. That officer declined to give the motion immediate consideration and refused to hear argument on his authority to grant such relief or to receive evidence in support of the motion. He continued it without further consideration to await a hearing on the merits of the company's second revised schedule of rates. He finally denied it at the same time he denied such schedule of rates by decision contained in his order No. 6357 and entered in his docket No. 496.

On the face of that decision it appears that he did not deny the motion on its merits but merely *pro forma.* He expressly stated therein that he could not determine the motion in the time at his disposal and that it would be

needless for him to try since complainant by an appeal to the public utility hearing board could obtain a full hearing on its motion there. Those are words of abdication of whatever power and authority he possessed under the statute to grant complainant emergency relief. Here, indeed, was an administrative tribunal frankly unwilling even to consider the extent of its powers to grant relief in an alleged emergency.

In view of such an arbitrary disposition of complainant's motion for relief and the extreme urgency and importance of the issues of confiscation of property and denial of due process of law raised thereby it seems to me unreasonable to send the complainant back to the same tribunal to apply for the same relief. If the administrator again refuses to accept jurisdiction or denies relief where would complainant go and how soon could those issues be determined? Apparently, according to the majority, it must remain within the administrative process and appeal to the public utility hearing board, and thereafter to this court. The delay necessarily inherent in so circuitous a procedure for obtaining emergency relief from daily confiscation of property is obvious and should give pause for the gravest consideration. In my view such procedure in a case of this kind scarcely comports with the guaranty of our Rhode Island constitution that every person within this state "ought to obtain right and justice * * * promptly and without delay * * *." Article I, sec. 5.

Complainant first applied for temporary emergency relief in November 1948. If, since that time, it has been actually suffering daily confiscation of its property in the amount that it alleges and is now going to be required to pursue the circuitous remedies indicated by the majority opinion its losses will assume impressive proportions and will be irrecoverable. Losses of that character, it was observed in *Federal Power Comm'n* v. *Natural Gas Pipeline Co.,* 315 U. S. 575, cannot be made up in the future. And it was in appreciation of that very fact that this

court, in *Public Utilities Comm'n* v. *East Providence Water Co.* (R. I.), 133 A. 347, said, in suspending a stay, pending appeal, of certain rates desired by the company, "* * * it is not clear how the water company can be protected against loss, in the event that said order shall be sustained, unless an order is made that the appeals shall not operate as a stay as to them." Where such an order is thus entered permitting the company temporarily to charge a nonconfiscatory rate mere running of time does not irreparably harm the company.

In the case at bar the majority of the court, in effect, did the opposite and granted the administrator's motion to stay the order of the superior court, which was favorable to the company, pending the appeal in this court, thus restricting the company to the alleged confiscatory rates for an indefinite period. The balance of hardship was thus weighted against the company carrying with it the necessary consequence that unless determination of its application for emergency relief could be obtained promptly any loss which it might ultimately prove that it had sustained during the interim would be irrecoverable. That there was in such circumstances good ground for invoking equity and interposing an injunction would seem to be obvious. As was said in *City of Council Bluffs* v. *Omaha & C. B. St. Ry.*, 9 F.2d 246, 249: "If the continuance of that injury could not be prevented by a temporary injunction, it could not be prevented at all, and there is, in our opinion, no doubt that the court below had the judicial power to prevent by a mandatory injunction, if necessary, the continuation of this violation of the Constitution and irreparable injury until the hearing and decision of this case on the merits."

In the circumstances, therefore, I am of the opinion that the majority decision is tantamount to a denial of due process of law. The principle of exhaustion of administrative remedies is a false light in the instant situation and may lead to a gross injustice to the complainant. The

cases cited by the majority in which that principle was the guide do not present situations at all comparable to that in the case at bar. In the first place not one of those cases involved a question of alleged confiscation of a public utility's property under alleged confiscatory rates for service.

The case of *Myers* v. *Bethlehem Shipbuilding Corp., supra,* did not even involve a public utility. In *United States* v. *Illinois Central R. R.,* 291 U. S. 457, the court said that the order of the commission to the railroad was merely an order to show cause why certain *proposed* joint barge-rail rates should not be established *in the future* and thus involved only the administrative process with which the railroad should comply. No question of continuing daily confiscation of property was raised. The same is true of the case of *St. Clair Borough* v. *Tamaqua & Pottsville Elec. Ry.,* 259 Pa. 462. There the public utility was the defendant and it was the municipality which was seeking relief by the judicial process rather than relief within the administrative process where the court held it properly belonged.

After their discussion of those cases the majority cite several other cases but without any comment thereon. In my opinion they do not lend any aid in determining what is the appropriate remedy in a case of alleged confiscation. One of them, however, contains language which recognizes the right to an injunction in such a case. In *Abelleira* v. *District Court of Appeal,* 17 Cal.2d 280, 296, the court, in commenting on certain cases which had been cited to it, said that they were not in point because they were cases "dealing with rate orders of regulatory commissions, where the administrative body imposes a confiscatory rate on a public utility. Continued operation of the business at the rate imposed pending the appeal may in some instances be so unprofitable as to amount to a destruction of the business, and therefore a taking of property without due process of law. The courts in these cases issue injunctions

to stay the enforcement of the new rate until a final determination of its validity, in order to protect the constitutional rights of the petitioning utilities. In brief, these decisions establish the right to equitable relief to protect the property rights of a petitioner from irreparable injury immediately threatened by a void administrative act."

On the other hand, the large number of cases which the majority list in their opinion as exceptional are examples of alleged confiscation to prevent which equity was properly invoked. In those cases the court declined to confine the utility to the administrative process because the question raised was a judicial question which did not require awaiting exhaustion of administrative remedies. In this respect *Oklahoma Natural Gas Co.* v. *Russell,* 261 U. S. 290, *Smith* v. *Illinois Bell Tel. Co.,* 270 U. S. 587, and *Prendergast* v. *New York Tel. Co.,* 262 U. S. 43, are especially significant. The fact of the matter is they are exceptional only because they are cases which involved alleged confiscation of the property of a public utility under existing or threatened confiscatory rates for service, and as such were not considered within the administrative process so as to call for the application of the principle of exhaustion of administrative remedies.

In the case at bar it is to be noted that the company did not ignore any possible remedy for emergency relief within the administrative process. On the contrary, it applied to the administrator and he denied, out of hand so to speak, its motion for such relief. Complainant then appealed to the public utility hearing board. Under the authorities above cited it did not have to pursue that remedy further before seeking the aid of equity in order to prevent confiscation of its property. Whether or not the remedy by statute was fully adequate to protect complainant's constitutional right was for the superior court to decide. But in any event, in my opinion, its *jurisdiction,* in the exercise of its equity powers, to grant or deny relief cannot be successfully questioned.

I am, therefore, not persuaded by the majority's discussion of complainant's failure properly to apply for emergency relief to the administrator. That matter, in my view, cannot adversely affect the *jurisdiction* of the superior court. Even though the administrator may be vested with the power under §41 or under the proviso in §45 to grant temporary emergency relief it does not follow that thereby the superior court has been or could be deprived of its judicial power in equity to prevent the taking of complainant's property without just compensation. Complainant is entitled to choose that remedy in preference to the statutory remedy if deemed by it to be more efficacious in the protection of its constitutional right; and the superior court may apply such remedy if it feels that complainant has not a remedy at law adequate for that purpose.

As for the majority view that the administrator has dealt fairly with the complainant in that he has, in effect, granted it immediate temporary relief by allowing his order of April 15, 1948 to become effective notwithstanding complainant's appeal to the public utility hearing board, I cannot agree. In the first place no question of emergency relief was presented to the administrator before that order was issued. Complainant's motion for such relief was not filed until sometime in November 1948 after such order had been in effect several months. In the second place the administrator had no power to stay his order pending appeal to the public utility hearing board. That order provided for new permanent rates, not temporary rates, and became effective of necessity because the statute does not provide for a stay thereof pending such an appeal as it does pending an appeal from the board to this court. I can find nothing in the statute which supports the majority view that complainant's appeal to the public utility hearing board necessarily vacated the administrator's order establishing new permanent rates. To say that it did

raises a grave question of legality of those rates now being charged by complainant.

To summarize, the rates fixed by that order are not temporary but permanent and whether they are fair and reasonable is a question raised by the appeal to the board. That question is exclusively administrative and must ultimately be decided within the administrative process. Until the board decides the appeal those rates are in effect by force of the statute and not by grace of the administrator. The question of *minimum* rates to be *temporarily* charged pending such determination in order to prevent confiscation of complainant's property is an entirely different question and one that is clearly judicial in its nature. Complainant properly submitted it for determination to the superior court.

I express no opinion on the merits as to whether complainant clearly proved its allegation of confiscation, nor on the subsidiary question whether certain evidence was competent, relevant and admissible to prove the fact of alleged confiscation. Consideration of those questions is not necessary to a determination of the question of the superior court's jurisdiction. On my view of the jurisdictional question it would be necessary for the court to pass upon those questions but on the majority view we do not reach them.

*Swan, Keeney & Smith, Eugene J. Phillips, Marshall Swan,* for complainant.

*Abraham Belilove,* Chief Special Counsel, *William E. Powers,* Attorney General, *Edward F. J. Dwyer,* Assistant Atty. Gen., for respondent.